## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CULLY PORTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-21-00612-PRW |
| | ) | |
| PONCA CITY INDEPENDENT SCHOOL | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court are the Motion for Summary Judgment (Dkt. 119) filed by Defendants Shelley Arrott (misidentified as "Shelly Arrott"), Thad Dilbeck, Bret Smith, Jared Freeman, Brad Parent (collectively the "School Employees"), and Independent School District No. 71 of Kay County, Oklahoma, commonly known as Ponca City Public Schools (the "School District," and together with the School Employees, the "School Defendants"); Plaintiff Cully Porter's Response (Dkt. 126); and the School Defendants' Reply (Dkt. 129). For the reasons that follow, the Court **GRANTS** the Motion (Dkt. 119).

### *Background*

This case arises from a hazing incident involving sexual harassment on the Ponca City High School basketball team. In June 2017, Defendants Kelby Cross and Avery Revard were seniors and Porter was a freshman on the basketball team. Arrott was the superintendent; Smith was the Director of Maintenance, Risk Manager, and Title IX

Coordinator; Dilbeck was the Principal of Ponca City High School; Freeman was the Athletic Director, and Parent was a math teacher and coach.

## I.    The June 2017 Assault

From June 22–24, 2017, Porter, Cross, Revard, and ten other Ponca City players attended a basketball camp organized by Oral Roberts University, along with Coach Parent[1] and non-defendants head coach Keenen Curry and coach Brandon Wilson. On either June 22 or 23, after the team had finished their basketball games for the day, they went to their hotel to shower before heading to dinner. Porter alleges that after the students in his room finished showering, one non-defendant student stood lookout while Cross held Porter down and Revard "pulled [his] pants down and flopped [his] penis on [Porter's] forehead."[2] The students apparently refer to this particular form of hazing as "the Flopper." About five to ten minutes later, Head Coach Curry came to Porter's room and instructed the students to get on the bus. Porter did not tell any adult about the assault at that time.

After the team ate dinner, they returned to the hotel room and began a video game tournament. Porter alleges that while the team was playing the game, Cross and Revard repeated the maneuver on another freshman, and attempted to do the same to a third student who managed to fight them off and run to another room. After this, there were no further incidents, and no one discussed the assaults for the rest of the trip.

---

[1] Although the record contains conflicting evidence as to whether Coach Parent attended the camp, the School Defendants do not dispute his presence for the purposes of their Motion. *See* Mot. (Dkt. 119), at 9–10.

[2] Pl. Dep. (Dkt. 126-1), at 60:16–23.

Initially, no one reported these incidents to the coaches, and Head Coach Curry testified that he did not know anything was amiss or observe any unusual behavior by the students. During the trip, Porter texted his mother, Amanda Cain, "I got the flopper, and I never want it again."[3] Porter's mother responded that they would discuss the matter when Porter got home. At the conclusion of the camp, the team returned to Ponca City with no further incidents or discussion of the incident. Once he got home, Porter told his parents what happened. His mother then scheduled a meeting with Curry the following Monday, June 26, 2017.

Before the scheduled meeting, at practice, one of the alleged victims approached Curry and told him what had happened on the trip. Curry then told Porter that he would be kicking Cross and Revard off the team. Curry informed Revard the same and immediately sent him home.[4] Curry then reported the allegations to Athletic Director Freeman, who advised that he would commence an investigation. Freeman contacted Superintendent Arrott and Principal Dilbeck to inform them of the situation.

After practice, Porter and his mother met with the coaches. Head Coach Curry told Porter that Cross and Revard's behavior was unacceptable, and he arranged for Porter and his mother to meet with Athletic Director Freeman. Porter and his mother met with Freeman and an officer with the Ponca City Police Department, where Porter described what happened. Freeman assured them that he would investigate the matter. The officer

---

[3] *Id.* at 79:18–24.

[4] Cross did not attend practice that day for unrelated reasons.

recommended that Freeman file a report with the Jenks Police Department (as the assault occurred in Jenks), and Freeman did so.

At the next basketball practice, Curry discussed the assaults with the team. He warned the players that he would not tolerate that sort of behavior and that he would "happily" kick anyone else who engaged in such practices off the team.[5]

Athletic Director Freeman, Principal Dilbeck, and the officer investigated the allegations under the oversight of Superintendent Arrott and Risk Manager Smith. The investigation involved interviews with the alleged victims, Cross and Revard, the coaches, and the non-party student witnesses. Cross and Revard admitted their role in the assault. Freeman kept the parents apprised of the investigation's status as it progressed. At the conclusion of the investigation, Freeman and Principal Dilbeck, after consulting with Superintendent Arrott, permanently banned Cross and Revard from athletics and suspended them from school for ten days.

Despite Porter's initial interest in pressing criminal charges against Cross and Revard, he and his family ultimately declined to do so. Despite that, the School District Administration attempted to press charges, but the Jenks Police Department declined. Afterwards, Porter's mother contacted the school counselor to rearrange Porter's schedule to ensure that he would not be in class with Cross or Revard. As a result, Porter had no classes with Cross or Revard when the school year began. In fact, he only ever had one interaction with Revard following the investigation, in a Snapchat group chat.

---

[5] Pl. Dep. (Dkt. 126-1), at 67:19–25.

## II.    Post-Assault Harassment

The parties agree that Porter suffered additional harassment following the assault, but they dispute the specifics. According to Porter, he endured verbal, electronic, and physical harassment throughout the remainder of his high school career, all related to the assault. Specifically, he testifies that students called him several different names and teased him regarding the assault as early as the start of the school year in 2017. He says that it turned physical on "two or three" occasions during his freshman year, when he "was pushed down a flight of stairs and called a faggot the whole way . . . down."[6] He also testifies that each time he experienced harassment, he reported it to his counselor, non-party assistant principal Krystina Muralt.[7] He believes that Muralt did nothing in response, due to the fact that the harassment persisted and, to his knowledge, no one was disciplined.[8]

The parties do not dispute that in Spring 2019, Porter's mother reported some verbal and electronic harassment to Assistant Principal Muralt. Specifically, Porter told his mother that some of Revard's friends called him a snitch, and that on other occasions upperclassmen called him "Avery[ Revard's] bitch" and "sex doll."[9] Porter's mother

---

[6] *Id.* at 227:6–17.

[7] *Id.* at 85:13–88:11, 227:18–229:13.

[8] *Id.* at 85:13–88:11, 178:6–20.

[9] Porter-Cain Dep. (Dkt. 126-6), at 94:4–97:2.

reported these incidents to Muralt who was "very . . . [c]oncerned."[10] Porter's mother did not know what Muralt did in response.[11]

Muralt's testimony generally confirms that Ms. Cain reported the verbal and electronic harassment, with the first report on February 6, 2019.[12] Muralt testified that she was unaware of any post-assault harassment until that date.[13] After Ms. Cain's report, Muralt called Porter in to ask about the incidents. Porter said that he did not know the identities of the perpetrators of the alleged verbal harassment. He did name another student who posted a harassing social media post. Muralt asked if Porter needed to go home, but he declined. Muralt told Porter that if he experienced further harassment, he could come into either her or the counselor's office to take a break. So that Porter wouldn't have to make frequent visits to the office, she advised him to text his mother about any further incidents, who could then notify Muralt.

Muralt then called Porter's mother to inform her of the situation. Two days later, Porter's mother went to Muralt's office and identified a student who called Porter "Avery[ Revard's] bitch." After this, Muralt and the student resource officer visited the homes of the two identified students to address the situation.[14]

---

[10] *Id.* at 97:3–11.

[11] *Id.*

[12] Muralt Dep. (Dkt. 119-13), at 32:18–33:5, 39:13–40:3.

[13] *Id.* at 33:13–15.

[14] *Id.* at 50:24–52:15.

The parties do not dispute that despite the assault and the post-assault harassment, Porter continued to play on the basketball team all four years of high school, playing in every varsity game from his sophomore through senior years. He also participated in other extracurricular activities and successfully graduated from Ponca City High School in the spring of 2021. He now attends college in North Dakota.

Porter now brings Section 1983 claims against the School Defendants and Title IX claims against the School District.[15] The School Defendants move for summary judgment as to each claim.

### Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16] A genuine issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[17] Evidence that is "merely colorable" or "not significantly probative" will not defeat a motion for summary judgment.[18] A fact is material if it "might affect the outcome of the suit under the governing law."[19]

---

[15] The Court previously dismissed Porter's state law negligence claims against the School Employees. *See* May 6, 2022, Order (Dkt. 31).

[16] Fed. R. Civ. P. 56(a).

[17] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citation omitted).

[18] *Id.* at 249–50 (citation omitted).

[19] *Id.* at 248.

The moving party bears the initial burden of showing beyond a reasonable doubt the absence of a genuine issue of material fact.[20] Once the movant has met his initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[21] Courts may only consider admissible evidence in reviewing summary judgment, but the evidence need not be submitted "in a form that would be admissible at trial."[22] Rather, the proponent must show that the evidence is capable of presentation in an admissible form.[23] Courts must view all facts and reasonable inferences in the light most favorable to the nonmovant.[24]

## *Analysis*

### I.    Despite Porter's failure to comport with the local rules, the Court proceeds on the Motion as briefed.

As a preliminary matter, the Court notes that Porter failed to comply with the local rules in his Response. Generally, Federal Rule of Civil Procedure 56(c) requires a party asserting that a fact is genuinely disputed to support his assertion by "(A) citing to parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, . . . ." If a party does not properly address another party's fact assertions as required by Rule 56(c), a district court may:

---

[20] *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (citation omitted).

[21] *Anderson*, 477 U.S. at 256.

[22] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (internal quotation marks omitted) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[23] *Id.* (citations omitted).

[24] *Anderson*, 477 U.S. at 255.

> (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.[25]

Additionally, the Local Civil Rules requires parties moving for summary judgment to begin their brief "with a section stating the material facts to which the movant contends no genuine dispute exists. . . . in concise, numbered paragraphs."[26] Similarly, opposing parties, must open their brief in opposition with a "section responding, *by correspondingly numbered paragraph*, to the facts that the movant contends are not in dispute and state any fact that is disputed."[27] Porter did not do so.

Under LCvR56.1(e), "[a]ll material facts set forth in the statement of material facts of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the nonmovant using the procedures set forth in this rule." The Tenth Circuit has upheld this approach, noting that district courts are under no obligation "to conduct a fishing expedition" to make up for a deficient response.[28] On a motion for summary judgment, it is the responding party's burden "to ensure that the factual dispute

---

[25] Fed. R. Civ. P. 56(e).

[26] LCvR56.1(b).

[27] LCvR56.1(c) (emphasis in original).

[28] *Coleman v. Blue Cross Blue Shield of Kan., Inc.*, 287 Fed. Appx. 631, 635 (10th Cir. 2008); *see also Glossip v. Chandler*, No. CIV-14-0665-F, 2021 WL 1240695, at *1 (W.D. Okla. Apr. 2, 2021).

is portrayed with particularity, without depending on the trial court to conduct its own search of the record."[29]

Porter has not sufficiently identified which of the School Defendants' facts are in dispute. Thus, it would be appropriate to deem the School Defendants' facts admitted, but the Court declines to punish Porter for the derelictions of his counsel. And striking the deficient response and ordering Porter to file a new response that complies with the local rules would essentially be granting Plaintiff a *tenth* extension in a case that has been pending for four years. Porter at least generally cites to the record, and the School Defendants, in Reply, adequately parsed the facts Porter attempts to dispute in his Response.

## II.   Porter's Title IX Claims

Porter brings Title IX claims against the School District for discrimination and retaliation. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."[30] Courts generally assess Title IX claims similarly to Title VII claims.[31]

---

[29] *Coleman*, 287 Fed. Appx. at 635 (citation and internal quotation marks omitted).

[30] 20 U.S.C. § 1681(a).

[31] *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001); *Doe v. Univ. of Denver*, 1 F.4th 822, at 829 n.5 (10th Cir. 2021).

**A.      The Court grants the Motion as to the Title IX discrimination claims.**

A funding recipient's "'deliberate indifference to one student's sexual harassment of another constitute[s] intentional discrimination on the basis of sex' prohibited by Title IX."[32] Because a school district is only liable for its own misconduct, a plaintiff must show that "the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school."[33]

The School District argues that it is entitled to summary judgment based on the first and second elements. The School Defendants did not address the third or fourth elements in their Motion, but Porter addressed them in Response, and in Reply, the School Defendants argue that there is no genuine issue of material fact exists as to those elements as well. Courts generally do not consider issues raised for the first time in a reply brief, but they "make an exception when the new issue argued in the reply brief is offered in response to an argument raised in the plaintiff's brief."[34] Once Porter contended that the record shows that the post-assault harassment was so severe, pervasive, and objectively offensive, that he was effectively denied equal access to the school's resources and opportunities, the

---

[32] *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1098 (10th Cir. 2019) (first quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005) and then citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

[33] *Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1246 (10th Cir. 1999) (citing *Davis*, 526 U.S. at 642–45). *See Farmer*, 918 F.3d at 1098 (first citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998) and then citing *Davis*, 526 U.S. at 640–43).

[34] *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1119 (10th Cir. 2015) (cleaned up and citation omitted).

School Defendants "were free to amplify their argument in reply" by contending that there is no genuine issue of material fact as to those elements either.[35]

Porter divides his claim, arguing that the School District was deliberately indifferent to (1) conduct preceding the assault and (2) harassment following it. Both are actionable Title IX theories.[36] As such, the Court will address them separately.

### 1. The School District lacked actual knowledge of a substantial risk of abuse prior to the Assault.

The School Defendants argue that there is no evidence that any School District employees knew of "the Flopper" prior to the assault. Regarding actual knowledge, a plaintiff must establish that a school district had "actual knowledge of a *substantial risk of abuse*[.]"[37] This standard does not require a school district to "receive[] a clearly credible report of sexual abuse from the plaintiff-student" to be put on notice.[38] Instead, prior reports involving other students may suffice to establish actual notice so long as the plaintiff shows that the school district "had 'actual knowledge of a substantial risk of abuse to students

---

[35] *Otten v. BNSF Ry. Co.*, No. 22-8025, 2023 WL 1948626, at *5 (10th Cir. Feb. 13, 2023)

[36] *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1311 (10th Cir. 2020); *Jackson*, 544 U.S. at 173–74 ("Retaliation against a person because that person complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action."); *See also Ross*, 180 F. Supp. 3d at 965 ("A court can find a Title IX violation when a [school] exhibits deliberate indifference before an attack that makes a student more vulnerable to the attack itself, or when a [school] exhibits deliberate indifference after an attack that causes a student to endure additional harassment." (quoting *Ross v. Corp. of Mercer Univ.*, 506 F.Supp.2d 1325, 1346 (M.D.Ga.2007)).

[37] *Escue v. N. OK Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) (emphasis supplied by *Escue*) (citation and internal quotation marks omitted).

[38] *Id.*

based on prior complaints by other students.'"[39] But prior reports that are "too dissimilar, too infrequent, [or] too distant in time . . . [do not] provide the school with actual knowledge[.]"[40] Courts are to "analyze the information reported to relevant officials in their totality, . . . draw[ing] all reasonable inferences favorably to the nonmovant."[41]

All of the deposed employees have denied knowing what "the Flopper" was prior to the report of the assault.[42] Porter claims that Principal Dilbeck "stated that he believes that some investigation regarding 'The Flopper' was done in the past, but he is unsure whether it was fully investigated or whether a determination was reached as to those incidents."[43] The part of Dilbeck's deposition on which Porter relies, however, only pertain to the investigation of the assault itself, not earlier incidents.[44] In fact, Dilbeck testified that

---

[39] *Ross v. Univ. of Tulsa*, 180 F. Supp. 3d 951 (N.D. Okla. 2016), *aff'd*, 859 F.3d 1280 (10th Cir. 2017) (quoting *Escue*, 450 F.3d at 1153–54. The Court notes that district courts are split as to "whether notice of prior complaints [of sexual harassment] as opposed to notice of the current harassment for which redress is sought triggers liability under Title IX." *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008). And the Tenth Circuit has not yet resolved the issue. *See Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1057 (10th Cir. 2023). But because the School District does not deny that notice can theoretically consist of prior reports of sexual harassment (*see* Reply (Dkt. 129), at 8), the Court need not weigh in on the issue.

[40] *Escue*, 450 F.3d at 1153–54.

[41] *Forth*, 85 F.4th at 1055 (citation omitted).

[42] Arrott Dep. (Dkt. 126-12), at 20:21 ("I didn't know what the flopper was."); Curry Dep. (Dkt. 126-2), at 28:13–14 ("I had no clue what the flopper was until my athletic director told me."); Wilson Dep. (Dkt. 126-4), at 60:14–17; Dilbeck Dep. (Dkt. 126-7), at 92:9–93:1; Bradley Parent's Tr. (Dkt. 119-2), at 36:15–37:9; Smith Dep. (Dkt. 126-15), at 179:20–22; Muralt Dep. (Dkt. 126-13), at 90:6–12.

[43] Resp. (Dkt. 126), at 14.

[44] Dilbeck Dep. (Dkt. 126-7), at 24:19–25:12, 30:5–23, 45:15–46:17.

he was unaware of *any* other incident where a student alleged that they were sexually assaulted by another student or subjected to hazing in sports.[45]

Next, Porter cites to Cross's "Proposed Statement" that "coaches were absolutely aware of the hazing. The flopper had been the move for at least 4 years, and which happened to me multiple times. [sic]."[46] Notwithstanding that Porter utterly fails to explain how this unsworn "Proposed Statement" would be admissible (and Defendants argue it isn't), Cross's sworn deposition testimony is quite different, where he testified that "[t]he school was not absolutely aware of [naked horseplay], no. I think the school may have been aware that there was horseplay that went on. But I don't think that they thought it to be any more extreme than normal horseplay."[47] Moreover, Cross also said that he was only aware of one pre-assault "Flopper" incident—one in which he was the victim and no adult had knowledge.[48]

Porter also construes a note documenting the consequences imposed on Revard and Cross for the assault as referring to an incident in 2016.[49] But the note relates to the June

---

[45] *Id.* at 92:9–93:1.

[46] "Kelby Cross Proposed Statement" (Dkt. 126-11).

[47] Cross Dep. (Dkt. 126-3), at 30:2–19.

[48] *Id.* at 32:4–33:10, 19:18–21:18 ("I wouldn't say [that the flopper happened to me] in the presence of coaches either because they were at the front of the bus and it was dark and we were at the back of the bus. [sic]").

[49] Discipline Docs. (Dkt. 126-10).

2017 assault.[50] And in any event, the note does not show that any employee of the School District knew of a substantial risk of abuse prior to the assault.

This leaves only Porter's speculation that Coaches Wilson and Parent knew of "the Flopper." On the bus, Revard purportedly asked Wilson if he "wanted" "the Flopper".[51] Porter testifies that he witnessed the exchange and that Wilson responded by grinning and Parent, who apparently was in earshot, responded by "laughing really hard."[52] Viewing this in the light most favorable to Porter, there could be a fact issue as to whether Wilson and Parent knew what "the Flopper" was. But the actual notice standard requires more than awareness of the nature of the act. It requires that Wilson or Parent (or any other employee of the School District) knew of a "substantial risk of abuse" to a student.[53] As such, Porter has not shown a genuine issue of material fact as to whether any of the School Defendants had actual knowledge of a substantial risk of abuse to students based on prior complaints.[54] Summary judgment on Porter's "pre-assault" deliberate indifference claim is therefore appropriate.

---

[50] *See* Dilbeck Dep. (Dkt. 126-7), at 53:21–54:9; Arrott Dep. (Dkt. 126-12), at 50:19–51:2; Pl. Dep. (Dkt. 119-3), at 109:2–16.

[51] Wilson's Dep. (Dkt. 126-4), at 60:1–64:8; Ponca City Police Report (Dkt. 126-5), at 5.

[52] Pl. Dep. (Dkt. 126-1), at 121:10–122:11.

[53] *Escue*, 450 F.3d at 1154 (emphasis in original).

[54] To the extent that Porter relies on the unreported instances of hazing detailing in the facts section of his brief, the Court notes that, even ignoring their lack of evidentiary support and construing them in the light most favorable to Porter, they are either "too dissimilar" to the conduct at issue here or too infrequent to provide the school with actual knowledge of a substantial risk of abuse. *Id.* at 1153–54.

2. *Regarding the post-assault harassment, genuine issues of material fact exist as to actual knowledge and deliberate indifference, but Porter has not shown that he suffered severe and pervasive harassment that deprived him of educational opportunities.*

The School Defendants claim that there is no evidence of further incidents of sexual harassment after the June 2017 assault. That, however, is unsupported by the record. As discussed in greater detail above, Porter testified that he endured harassment throughout his high school career, reporting each occasion to Assistant Principal Muralt.[55] For her part, Muralt said that she is unaware of any harassment or bullying that occurred between the assault and the reports she received in 2019.[56] Thus, a genuine issue of material fact exists as to whether the School District had actual knowledge of a substantial risk of post-assault harassment.

But to show deliberate indifference to that substantial risk, a plaintiff must demonstrate that the school's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."[57] This is a "high standard" that does not require schools to purge all "actionable peer harassment" or to "engage in particular disciplinary action. Indeed, courts should refrain from second-guessing the disciplinary decisions made by school administrators."[58] But a "minimalist response is not within the

---

[55] Pl. Dep. (Dkt. 126-1), at 84:13–88:8, 178:6–20, 227:12–228:23.

[56] Muralt Dep. (Dkt. 126-13), at 33:6–12.

[57] *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d at 1313 (internal quotation marks omitted) (quoting *Davis*, 526 U.S. at 646–47).

[58] *Id.* 1313 (quoting the same) (internal citations and quotation marks omitted).

contemplation of a reasonable response[.]"[59] Porter has shown a genuine issue of material fact as to whether the School District adequately responded to his reports of post-assault harassment.

A plaintiff must also, however, establish that the harassment at issue "is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that the victim-student[ is] effectively denied equal access to an institution's resources and opportunities."[60]

> Whether gender-oriented conduct rises to the level of actionable "harassment" thus depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved. Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.[61]

"Matters of degree—such as severity and pervasiveness—are often best left to the jury[,]" as the "severity and pervasiveness evaluation. . . is quintessentially a question of fact[.]"[62]

---

[59] *Escue*, 450 F.3d, at 1155 (quoting *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)).

[60] *Davis*, 526 U.S. at 651.

[61] *Id.* at 651–52 (internal citations and quotation marks omitted).

[62] *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d at 1312.

Most of the post-assault harassment that Porter alleges amounts to teasing and name-calling, for which Title IX damages are not available.[63] Porter also says that he was pushed down the stairs and called a "faggot" on two or three occasions in his freshman year.[64] The Court is unconvinced that a reasonable juror would conclude that this conduct (although disturbing), taken in the aggregate and construed in the light most favorable to Porter, can be said to be severe and pervasive.[65] But even assuming that it was, Porter has not shown that he was "effectively denied equal access" to the School District's resources and opportunities.

Indicators of deprivation of educational opportunities include a decline in grades and changes in demeanor or classroom participation.[66] Additionally, the Tenth Circuit "has held that changes in class attendance, transfers out of classes, and changes in schools are harms that constitute deprivations of educational benefits."[67] The record reflects no such deprivations. Rather, it shows that Porter enjoyed a successful high school career, playing

---

[63] *Davis*, 526 U.S. at 652. ("It is not enough to show . . . that a student has been teased or called offensive names.").

[64] Pl. Dep. (Dkt. 126-1), at 10:7–13:17, 56:5–57:6, 137:1–25.

[65] *See, e.g., Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.*, No. CIV. 3:06CV1947PCD, 2009 WL 230708 (D. Conn. Jan. 30, 2009) (granting summary judgment and finding that where the victim "was subjected to name-calling and insults, had a straw thrown at her, had a pencil stuck under her butt, had her butt slapped . . . , and on one occasion, had her breasts and/or buttocks touched without [her] consent" was "collectively are not so severe, pervasive, and objectively offensive that they could reasonably be said to deprive S.B. of access to the educational opportunities or benefits provided by the school").

[66] *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003).

[67] *Doe v. Oologah-Talala Indep. Sch. Dist. No. 4 of Rogers Cnty.*, No. 21-CV-240-JDR-SH, 2024 WL 3972978, at *9 (N.D. Okla. Aug. 28, 2024) (collecting cases).

in every varsity game from his sophomore year through his senior year; graduated from the School District, where he participated in other extracurricular activities; and went on to attend college.[68] Porter alleges that as a result of the harassment, he "endured suicidal thoughts, lost friendships, and lost the ability to serve in the U.S. Air Force."[69] But Porter makes no effort to show how these had any impact whatsoever on his educational opportunities.[70]

---

[68] Cully Porter's Tr. (Dkt. 119-3), at 2, 3, 7–8, 60.

[69] Resp. (Dkt. 126), at 25.

[70] This holding is consistent with the caselaw. *Compare Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*, No. 121CV00978KWRJFR, 2023 WL 2573345, at *6 (D.N.M. Mar. 20, 2023) (granting summary judgment where, after one instance of gender-based harassment, the plaintiff completed her season as a member of the high school basketball team, played on the softball team, and graduated high school), *aff'd*, No. 23-2064, 2024 WL 1881076 (10th Cir. Apr. 30, 2024), *with C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1335–36 (D. Kan. 2008) (denying summary judgment where the record showed that the plaintiff was assaulted, received death threats, and called names "every day he went to school for the remainder of the school year," causing him to transfer to another school that did not offer the same athletic programs), *and Theno v. Tonganoxie Unified Sch. Dist No. 464*, 377 F. Supp. 2d 952 (D. Kan. 2005) (denying summary judgment where the plaintiff was diagnosed with multiple disorders and eventually left the school following years of verbal harassment).

Likewise, for a Title IX plaintiff to survive a motion to dismiss, he must allege deprivation of an educational benefit. *Compare Murrell*, 186 F.3d at 1248 (finding that the plaintiff stated a claim where she alleged she suffered repeated instances of battery and assault that resulted in her being hospitalized and homebound), *with Trentadue v. Redmon*, 619 F.3d 648, 653–54 (7th Cir. 2010) (affirming dismissal where students taunted her, put gum in her hair, and made threats against her, causing her to lose "nearly all of her friends," seek counselling, and suffer recurring nightmares because her "grades did not suffer, she was not extensively absent from school, she graduated with a class rank of 27 out of 500, and thereafter enrolled in college"), *and Roe v. Penn. State Univ.*, No. CV 18-2142, 2019 WL 652527, at *8 (E.D. Pa. Feb. 15, 2019) (dismissing complaint that failed to "detail a single instance about how she was deprived of access to [the university's educational benefits or opportunities, such as dropping classes (or elongating her enrollment at [the university]),

Porter compares this case to *Doe v. Sch. Dist. No. 1, Denver, Colorado*, where the Tenth Circuit found that the plaintiff had stated a claim for deliberate indifference where she alleged that she was repeatedly verbally harassed, blackmailed with nude photographs, told to commit suicide, and threatened with physical violence.[71] Importantly, however, she also alleged that this harassment "became so intolerable that [she] could not attend classes at the school. She worked at home, coming to school only to perform assignments before her regular classes began and after classes had ended."[72] She also avoided eating lunch in the cafeteria, and opted to use the back doors of the school instead of the main entrance.[73] Again, Porter has not shown that the harassment he endured altered his access to the school's resources and opportunities. Accordingly, summary judgment is warranted as to Porter's "post-assault" deliberate indifference claim.

**B.    The Court grants the Motion as to Porter's Title IX retaliation claims.**

Title IX "prohibits retaliation against individuals because they have complained of sex discrimination."[74] The School Defendants next move for summary judgment on Porter's retaliation claims, arguing that he cannot show that the school took any adverse action against him. Porter maintains that his retaliation claim survives because the School

---

withdrawing from [the university], stopping her employment as a [student] auxiliary officer or otherwise changing her educational activities.").

[71] 970 F.3d at 1311–12.

[72] *Id.* at 1312–1313.

[73] *Id.* at 1312.

[74] *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) (citing *Jackson*, 544 U.S. at 183).

District failed to (1) "comport with Title IX and school policies and procedures in addressing the initial assault" and (2) "address and seek to eliminate peer retaliatory sexual harassment for, at the very least, two years after [Porter's] report of abuse[.]"[75]

>    1.    *Porter has not shown that the School District retaliated against him in its investigation of the assault.*

Courts are generally to evaluate Title IX retaliation claims under the *McDonnell Douglas* burden-shifting framework.[76] Under this framework, the plaintiff must first establish a prima facie case for retaliation by showing that the defendant took adverse action against the plaintiff based on the plaintiff's protected activity.[77] This generally requires a plaintiff to show that "1) he or she engaged in protected activity; 2) defendant had knowledge of the protected activity; 3) materially adverse school-related action was taken against plaintiff; and 4) there was a causal connection between the protected activity and the adverse action."[78] An action is "materially adverse" if it "might have dissuaded a reasonable person from making or supporting a charge of discrimination."[79]

Porter argues that the School Defendants' investigations "were replete with procedural deficiencies."[80] Porter's only citation to the record in support of this allegation is the fact that Dilbeck erroneously told Porter's mother that the assault was not a Title IX

---

[75] Resp. (Dkt. 126), at 27.

[76] *Hiatt*, 858 F.3d at 1315 n.8.

[77] *Id.* at 1316.

[78] *Doe 1 v. Mount Saint Mary High Sch. Corp. of the State of Okla.*, No. CIV-22-992-R, 2025 WL 490011, at *15 (W.D. Okla. Feb. 13, 2025)

[79] *Douglass v. Garden City Cmty. Coll.*, 649 F. Supp. 3d 1152, 1167 (D. Kan. 2023)

[80] Resp. (Dkt. 126), at 28.

situation.[81] Porter presents no evidence that the School District's investigation was adverse or retaliatory. To the contrary, the record reflects that the School District investigated his report and punished the perpetrators. Porter has therefore not met his prima facie burden as to this claim, and summary judgment is appropriate.

> 2.     *Porter has not shown that the School District was deliberately indifferent to student-on-student retaliatory harassment.*

Contrary to the School Defendants' assertions, Title IX recipients can be liable for deliberate indifference to student-on-student retaliatory harassment.[82] The parties urge the Court to apply the same *McDonell Douglas* analysis to Porter's student-on-student retaliatory harassment claim. However, in *Doe v. School District Number 1, Denver, Colorado*, the Tenth Circuit held that retaliatory harassment for reporting misconduct is by its very nature an act of discrimination.[83] It proceeded to analyze the plaintiff's retaliatory harassment claim under the same deliberate indifference framework described above.[84] The Court therefore does the same.[85] For the same reasons discussed above, Porter's retaliatory harassment claim fails—he has not demonstrated harassment that was so severe, pervasive, and objectively offensive that it deprived him of educational resources or opportunities provided by the school. Accordingly, summary judgment is appropriate as to this claim.

---

[81] Porter-Cain Dep. (Dkt. 126-6), at 157:15–16; Dilbeck Dep. (Dkt. 126-7), at 23:5–24:10.

[82] *See Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d at 1311.

[83] *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d at 1310–11.

[84] *Id.* at 1308–15.

[85] *See C.H. v. Howard*, No. CV 21-574 GBW/JHR, 2023 WL 7279329, at *9 (D.N.M. Nov. 3, 2023) (The same elements apply to both "claims for student-on-student sexual harassment and student-on-student retaliation for reporting sexual harassment.").

Courts may grant summary judgment on grounds not formally raised in a summary judgment motion, "so long as the losing party was on notice that [he] had to come forward with all of [his] evidence."[86] A court commits reversible error on this basis if the losing party is prejudiced by this action.[87] "A party is procedurally prejudiced if it is surprised by the district court's action and that surprise results in the party's failure to support evidence in support of its position."[88] Here, because Porter fully briefed the deliberate indifference issue, he is not prejudiced by the Court's application of *Doe v. School District Number 1, Denver, Colorado*.

## III.   Summary judgment on the claims against the School Employees is warranted.

The School Defendants next seek summary judgment on Porter's equal protection claims against the School Employees individually. They raise the defense of qualified immunity. When the defense of qualified immunity is invoked, the plaintiff must demonstrate "(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so (2) that the right was clearly established at the time of the defendant's unlawful conduct."[89] If the plaintiff fails to satisfy either prong, the defendant is entitled to qualified immunity.[90] But "[i]f the plaintiff indeed demonstrates that the [defendant] violated a clearly established constitutional or statutory right, then the burden shifts back

---

[86] *Kannady v. City of Kiowa*, 590 F.3d 1161, 1170 (10th Cir. 2010).

[87] *Id.*

[88] *Id.* (citation omitted).

[89] *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013).

[90] *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

to the defendant, who must prove that 'no genuine issues of material fact' exist and that the defendant 'is entitled to judgment as a matter of law.'"[91]

Under Section 1983, a person acting under color of state law is liable for depriving another of constitutional rights.[92] The Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." A school employee may be held liable for a denial of equal protection under Section 1983 "upon a showing of deliberate indifference to known sexual harassment."[93] Because Section 1983 liability requires a "deliberate," and not merely negligent, deprivation, a school employee is liable for student-on-student harassment only where he "participates or *consciously acquiesces*" in the sexual harassment.[94] A plaintiff may show acquiescence by demonstrating that a school employee refused to reasonably respond to the sexual harassment.[95]

In his Response, Porter argues that the School Employees are liable for deliberate indifference as to (1) pre-assault hazing incidents; (2) their post-assault investigation; and (3) the post-assault harassment. First, as previously explained, the record shows that the only School Employee who may have heard of "the Flopper" prior to the assault is Coach

---

[91] *Id.* (quoting *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001)).

[92] 42 U.S.C. § 1983.

[93] *Murrell*, 186 F.3d at 1250.

[94] *Id.* (emphasis supplied by *Murrell*) (citation and internal quotation marks omitted).

[95] *Id.* (footnote omitted).

Parent.[96] But Porter points to no evidence that Parent participated or consciously acquiesced in the assault. Accordingly, Porter has not shown that the School Employees had the requisite knowledge to be liable under Section 1983 for pre-assault deliberate indifference.

Second, as to the investigation, Porter argues that the School Employees were deliberately indifferent because they (1) did not conduct a proper Title IX investigation; (2) improperly categorized the assault as hazing rather than sexual assault; and (3) failed to inform Porter or the other victims of their rights throughout the process.[97] But Porter makes no argument and cites to no authority that shows that these responses were clearly unreasonable. The record shows that the School Employees promptly and thoroughly investigated the allegations against Cross and Revard, punished them, and reported the assault to law enforcement. Indeed, a school "district's failure to comply with its regulations does not establish the requisite deliberate indifference" under Title IX.[98] And

---

[96] Coach Wilson is not a defendant in this case.

[97] Resp. (Dkt. 126) at 35–36.

[98] *Whitley v. Indep. Sch. Dist. No. 10 of Dewey Cnty., Okla.*, No. CIV-18-331-SLP, 2019 WL 7667329, at *8 (W.D. Okla. Apr. 22, 2019); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998) (noting the Court has not held that Title IX enables plaintiffs to obtain damages for violating "administrative requirements" like enactment of a grievance procedure).

to enforce Title IX's regulatory protections through Section 1983, Porter must still point to a right secured by Title IX.[99]

Third, as to the post-assault harassment, Porter identifies no School Employee with actual knowledge of the post-assault harassment. He only testified that non-party Assistant Principal Muralt knew of the post-assault harassment. "Personal liability under § 1983 must be based on personal involvement in the alleged constitutional violation."[100] Nowhere does Porter allege that any of the School Employees were involved in any way with the post-assault harassment. Accordingly, Porter has not shown that the School Employees actions violated Porter's equal protection rights, and they are entitled to qualified immunity for his claims against them.

## IV.    Summary Judgment is appropriate as to the *Monell* claims.

Finally, the School Defendants seek summary judgment as to Porter's *Monell* claims. The Amended Complaint appears to allege claims based on two alternate theories: violations of Porter's rights to (1) substantive due process and (2) equal protection.[101] In his response, Porter only addresses the latter.[102] Accordingly, Porter has abandoned his substantive due process *Monell* claim.[103]

---

[99] *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–85 (2002).

[100] *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011).

[101] *See* Am. Compl. (Dkt. 21), at 18–20.

[102] Resp. (Dkt. 126), at 34–39.

[103] *See Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992) (A plaintiff's "failure to rebut the arguments raised by" a defendant in his "motion for summary judgment is fatal to his attempt to raise and rebut such arguments on . . . appeal.").

Turning to the equal protection *Monell* claim, local government entities such as the School District are "persons" subject to suit under Section 1983.[104] Principals of municipal liability apply to school districts.[105] To establish municipal liability, a plaintiff must show both (1) a harm to the plaintiff caused by a constitutional violation, and (2) liability of the municipality for that violation.[106] For the reasons discussed above, Porter's *Monell* claim regarding the assault fails at the outset, as no reasonable juror could conclude that the school acted with deliberate indifference to known harassment.

Establishing municipal liability for the violation requires a plaintiff to "demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority."[107] Absent an official policy, the plaintiff must show that the discriminatory practice is "so permanent and well settled as to constitute a 'custom or usage' with the force of law."[108] There can be no municipal liability of a government entity "for an injury inflicted solely by its employees or agents."[109]

---

[104] *Sauers v. Salt Lake Cnty.*, 1 F.3d 1122, 1129 (10th Cir. 1993) (citing *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).

[105] *Murrell*, 186 F.3d at 1249; *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010).

[106] *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992) (citations omitted).

[107] *Murrell*, 186 F.3d at 1249 (citing *Randle v. City of Aurora*, 69 F.3d 441, 446–50 (10th Cir. 1995)).

[108] *Id.* (citation and internal quotation marks omitted); *Brammer-Hoelter*, 602 F.3d at 1189.

[109] *Monell*, 436 U.S. at 694.

To prevail on his *Monell* equal protection claim, Porter must show a policy or custom of deliberate indifference to sexual harassment.[110] Porter relies solely on a "failure to train" theory. Failure to adequately train or supervise employees can constitute an official policy, "so long as that failure results from deliberate indifference to the injuries that may be caused."[111] "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[112] It is not enough to show general deficiencies in a training program. Rather, a plaintiff must "identify a specific deficiency in the . . . training program closely related to his ultimate injury."[113]

In order to "satisfy the stringent deliberate indifference standard, 'a pattern of similar constitutional violations by untrained employees is 'ordinarily necessary[.]'"[114] Without notice of a particular deficiency in a course of training, "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[115] In the absence of a "pre-existing pattern of violations," failure to train claims only survive "in a narrow range of circumstances, however rare, in which the

---

[110] *Murrell*, 186 F.3d at 1249.

[111] *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023) (quoting *Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166, 1184 (10th Cir. 2020)).

[112] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[113] *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999).

[114] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019).

[115] *Id.* (quoting *Connick*, 563 U.S. at 62).

unconstitutional consequences of a failure to train are highly predictable and patently obvious."[116]

Here, the record does not support a pattern of similar constitutional violations by untrained employees, nor does it reflect the kind of "highly predictable and patently obvious" consequences required to establish deliberate indifference in a failure-to-train claim. To the contrary, the undisputed evidence shows that each School District Employee responded promptly upon learning of the assault. The only countervailing evidence is Porter's testimony that Muralt failed to act on his reports of post-assault harassment. But, viewing this in the light most favorable to Porter, a lone employee's failure to act—even if proven—does not demonstrate a *pattern* of constitutional violations, nor does it meet the narrow exception for obvious consequences.

## V.    The Court declines to exercise supplemental jurisdiction over the remaining state-law claims.

The only remaining claims are Porter's state-law claims against Revard and Cross. As the Amended Complaint does not invoke diversity jurisdiction, 28 U.S.C. § 1367 governs the Court's jurisdiction over the remaining claims. When a court has resolved all federal claims, it "may, and usually should, decline to exercise jurisdiction over any remaining state claim."[117] Courts are to consider the balance of the factors of judicial economy, convenience, fairness, and comity.[118] Here, "notions of fairness and comity

---

[116] *Id.* (quoting *Connick*, 563 U.S. at 63–64) (cleaned up).

[117] *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (citation omitted).

[118] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

would suggest that a case now composed of claims based entirely on state law should be tried in a state court."[119] Moreover, although the court has devoted substantial judicial resources to the federal claims, little has been spent on the remaining claims. And although convenience may cut against dismissal, "the balance of factors" predominately support dismissal. The Court therefore declines to exercise supplemental jurisdiction over the remaining claims.

### *Conclusion*

Accordingly, the Court **GRANTS** the Motion (Dkt. 119), **DISMISSES** the remaining state-law claims **WITHOUT PREJUDICE** to Porter's right to seek appropriate relief in state court, and **DENIES** the remaining pending motions as moot.

**IT IS SO ORDERED** this 4th day of June 2025.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

---

[119] *Power Equip. Maint., Inc. v. AIRCO Power Servs., Inc.*, 953 F. Supp. 2d 1290, 1298 (S.D. Ga. 2013).